**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | | |
|---|---|---|---|
| Sonos, Inc., | | § | |
| | | § | |
| | Plaintiff, | § | No. 6:20-cv-881-ADA |
| v. | | § | |
| | | § | |
| Google LLC, | | § | |
| | | § | |
| | Defendant. | § | |

**<u>PLAINTIFF SONOS, INC.'S REPLY CLAIM CONSTRUCTION BRIEF</u>**

## TABLE OF CONTENTS

I.      "MULTIMEDIA" ............................................................................................ 1

II.     "NETWORK INTERFACE".......................................................................... 2

III.    "PLAYBACK DEVICE" / "ZONE PLAYER"............................................ 2

IV.     "ZONE" ........................................................................................................... 3

V.      "ZONE CONFIGURATION …" / "GROUP CONFIGURATION" ............. 3

VI.     "ZONE SCENE … "......................................................................................... 7

VII.    "CAUSING THE SELECTABLE INDICATION … TO BE
        DISPLAYED"................................................................................................... 8

VIII.   "LOCAL AREA NETWORK"....................................................................... 8

IX.     "CLOUD" ........................................................................................................ 9

X.      "A MEDIA PARTICULAR PLAYBACK SYSTEM"................................. 9

XI.     "DATA NETWORK"..................................................................................... 10

XII.    "REMOTE PLAYBACK QUEUE" ............................................................. 12

XIII.   "AN INSTRUCTION … TO TAKE OVER RESPONSIBILITY FOR
        PLAYBACK"................................................................................................. 14

XIV.    "WHEREIN THE INSTRUCTION COMPRISES AN INSTRUCTION" ..... 15

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*CBT Flint Partners, LLC v. Return Path, Inc.*,
    654 F.3d 1353 (Fed. Cir. 2011).............................................................................. 10

*Fintiv, Inc. v. Apple, Inc.*,
    Case No. 18-cv-372, Dkt. 86 (W.D. Tex. Nov. 27, 2019)........................................ 11

*Groove Digital, Inc. v. United Bank*,
    825 F. App'x 852 (Fed. Cir. 2020) ......................................................................... 13

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
    558 F.3d 1368 (Fed. Cir. 2009)............................................................................... 14

*IGT v. Bally Gaming Int'l, Inc.*,
    659 F.3d 1109 (Fed. Cir. 2011)................................................................................. 5

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
    450 F.3d 1350 (Fed. Cir. 2006)......................................................................... 13, 14

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
    790 F.3d 1298 (Fed. Cir. 2015 .................................................................................. 1

*Merck & Co. v. Teva Pharms. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005)............................................................................... 11

Network Commerce, Inc. v. Microsoft Corp.,
    422 F.3d 1353 (Fed. Cir. 2005)............................................................................... 11

*Roy-G-Biv Corp. v. ABB, Ltd.*,
    Case No. 11-cv-622, 2013 WL 3884192 (E.D. Tex. July 25, 2013) ......................... 5

*Saunders Group, Inc. v. Comfortrac, Inc.*,
    492 F.3d 1326 (Fed. Cir. 2007)............................................................................... 13

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
    987 F.3d 1358 (Fed. Cir. 2021)............................................................................... 15

## PARTIES' PROPOSED CONSTRUCTIONS

| Claim Term | Sonos Construction | Google Construction |
|---|---|---|
| **"multimedia"** ['206 and '615 Patents] | "any type of media that comprises audio (including audio alone)" | Plain and ordinary meaning; no construction necessary at this time |
| **"network interface"** ['206, '615, '885 Patents] | " a physical component of a device that provides an interconnection with a data network " | Plain and ordinary meaning; no construction necessary at this time |
| **"playback device"** ['206, '615, '033 Patents] / **"zone player"** ['966, '885 Patents] | "a data network device configured to process and output audio" | Plain and ordinary meaning; no construction necessary at this time |
| **"zone configuration characterizes one or more zone scenes"** ['206 Patent] | "configuration data that provides an indication of one or more zone scenes" | No separate construction proposed. *See* "zone" and "zone scene" terms. |
| **"zone"** ['206 Patent] | | "an area or areas with one or more playback devices" |
| **"zone scene"** ['206 Patent] | No separate construction necessary. | "a group of two or more zones that are grouped according to a common theme by configuring the zones in a particular scene (*e.g.*, morning, afternoon or garden)" |
| **"zone scene identifying a group configuration associated with two or more of the plurality of independent playback devices"** ['206 Patent]  **"[first / second] zone scene comprising a [first / second] predefined grouping of zone players including at least the first zone player and a [second / third] zone player that are to be configured for synchronous playback of media when the [first / second] zone scene is invoked"** ['966, '885 Patents] | "a previously-saved grouping of [independent playback devices / zone players] that are to be configured for synchronous playback of media when the zone scene is invoked" | No separate construction proposed. *See* "zone" and "zone scene" terms. |
| **"group configuration"** ['206 Patent] | No separate construction necessary. | Indefinite |

| | | |
|---|---|---|
| **"invoked" / "invoke" / "invocation"** ['206, '966, '885 Patents] | Plain and ordinary meaning; no construction necessary at this time | ~~"applying a parameter or setting"~~ Plain and ordinary meaning; no construction necessary at this time |
| **"causing the selectable indication of the at least one of the one or more zone scenes to be displayed"** ['206 Patent] | Plain and ordinary meaning; no construction necessary at this time | Indefinite |
| **"local area network"** ['615 Patent] | "data network that interconnects devices within a limited area, such as a home or office" | Plain and ordinary meaning; no construction necessary at this time |
| **"cloud"** ['615 and '033 Patents] | Plain and ordinary meaning; no construction necessary at this time | ~~"over a network"~~ "over a wide-area network such as the Internet." |
| **"a media particular playback system"** ['615 Patent] | "a media playback system" | Indefinite |
| **"data network"** ['966, '033, '885 Patents] | "a medium that interconnects devices, enabling them to send digital data packets to and receive digital data packets from each other" | Plain and ordinary meaning; no construction necessary at this time |
| **"remote playback queue"** ['033 Patent] | Plain and ordinary meaning; no construction necessary at this time | "remote playback queue provided by a third party application" |
| **"an instruction for the at least one given playback device to take over responsibility for playback of the remote playback queue from the computing device, wherein the instruction configures the at least one given playback device to"** ['033 Patent] | Plain and ordinary meaning; no construction necessary at this time | "an instruction for the at least one give playback device…"; Instruction means one instruction. |
| **"wherein the instruction comprises an instruction"** ['033 Patent] | Plain and ordinary meaning; no construction necessary at this time | Indefinite |

## I.    "Multimedia"[1]

Google's extrinsic evidence is insufficient to overcome the clear intrinsic record (DI 64 at 3 (citing dictionaries and expert testimony)), which confirms that Sonos used the term "multimedia" in the '206 and '615 Patents to cover ***audio-only*** systems.[2]

It is indisputable that a preferred embodiment of the '206 and '615 Patents is a network ***audio*** system comprised of ***audio*** payers called "zone players." *E.g.*, '206 Patent at Fig. 1, 4:26-5:3; '615 Patent at Fig. 1, 3:17-37, 5:12-7:19.   Tellingly, the term "audio" is used at least 82 times in the '206 Patent and at least 118 times in the '615 Patent.  Google's construction of "multimedia," however, would impermissibly read this preferred embodiment out of the '206 and '615 Patent claims. *See, e.g., Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1304 (Fed. Cir. 2015) ("A claim construction that excludes a preferred embodiment is 'rarely, if ever, correct.'").

The '206 and '615 Patents also equate "multimedia" with just audio.  For instance, the '206 Patent states "[t]here are a number of ***multimedia players*** of which three examples 102, 104, and 106 are shown as ***audio devices***." '206 Patent at 4:31-33.  The '615 Patent explains that "networks can be used to connect one or more ***multimedia playback devices*** for a home or other location playback network (*e.g.*, a home ***music system***)" and that "***[m]usic and/or other multimedia content*** can be shared …." '615 Patent at 1:66-2:9.  This further confirms that the claim term "multimedia" must cover audio alone.

Finally, Google cannot discount the relevance of the "multimedia" construction in the prior D&M and ITC cases merely because those cases involved different patents.  DI 64 at 3-4.  This

---

[1] All emphasis herein has been added unless otherwise noted.

[2] Moreover, Google's citation to Dr. Almeroth's IPR testimony regarding an unrelated non-Sonos patent is misleading.  Google ignored that immediately after the cited testimony, Dr. Almeroth confirmed that the term "multimedia" can be used to described "***audio*** or video" alone.  DI 64, Ex. 10 at ¶ 15.  Dr. Almeroth's testimony is consistent with technical literature.  *See, e.g.*, Ex. 29 (stating that "multimedia file types" include various audio-only file types); Ex. 30-31.

argument ignores that the '949 Patent asserted in those cases is intrinsic evidence to the '615 Patent

here and that all these asserted Sonos patents have similar disclosure related to "multimedia."

## II.      "Network Interface"

Google only expressly challenges Sonos's separate construction of "data network," and

thus, Sonos's construction of "network interface" should be adopted.  *See* DI 64 at 4-5.

Moreover, Google is wrong to suggest that the dispute in the D&M case did not relate to

whether a "network interface" provides an interconnection with a ***data network*** (as Sonos has

construed that term here).  DI 64 at 5 n.4.  This is evident from the Delaware court's opinion:

> [T]he specification … provides that "[t]he zone player includes a network
> interface," which "facilitates a ***data flow between a data network … and the zone***
> ***player***," which supports [Sonos's] position that the network interface allows for
> ***data flow between the device and the data network in both directions (i.e. both to***
> ***and from the device)***. This construction is supported by the specifications of the
> other patents at issue. Therefore, I will adopt [Sonos's] construction.

Ex. 6 at 12-13 (internal citations omitted).[3]

## III.     "Playback Device" / "Zone Player"

Again, Google only expressly disputes Sonos's separate construction of "data network,"

and thus, Sonos's construction of "playback device"/"zone player" should be adopted.  DI 64 at 6.

Moreover, contrary to Google's suggestion, the Delaware court's opinion on the

construction of this term in the D&M case is relevant to the parties' dispute here regarding whether

a "data network" requires the transfer of ***digital data packets***.  DI 64 at 5 n.4.  In adopting Sonos's

construction,  the  Delaware  court  acknowledged  that  Sonos's  cornerstone  '395  Patent

---

[3] As with "multimedia," Google cannot discount the relevance of the "network interface"
construction in the D&M and ITC cases.  Google's argument ignores that one or more of the
patents asserted in the D&M case is intrinsic evidence to the '206, '615, and '885 Patents here and
that all these asserted Sonos patents have similar disclosure related to "network interface."

"characterizes the zone players as '*digital data processing devices*.'"  DI 60-6, p. 11.[4]

## IV.    "Zone"

While Google seeks to construe "zone" in the Zone Scene Patents, that word never appears as a standalone term in the claims.[5]  Instead, "zone" only appears as part of the compound terms "zone player," "zone configuration," and "zone scene" – all of which are already being construed.  Thus, Google's attempt to construe "zone" in isolation is unnecessary, procedurally inappropriate, and unhelpful to a jury.  DI 60, pp. 7-8; DI 64, pp. 6-7.

## V.    "Zone Configuration …" / "Group Configuration"

Google's indefiniteness position for "zone configuration" (and also "group configuration") is based on nothing more than feigned ignorance as to the meaning of the terms "zone configuration," "zone scene," and "group configuration" within the claims of the '206 Patent.  The reality is that, in the context of the intrinsic evidence, a POSITA would have no trouble understanding the meaning of these terms and how they fit together to define the claimed invention.

The Zone Scene Patents disclose a new mechanism for grouping zone players together for synchronous playback that was intended to advance upon Sonos's prior mechanism for grouping, which required a user to select each zone player to be included in an *ad hoc* manner, one-by-one, every time the user wished to play media in that group configuration.  Ex. 1 at 8:7-22; Ex. 26 at Appx. N ("'407 Prov"), p. 30.  The Zone Scene Patents recognized that this prior mechanism could be inefficient and time consuming in some situations – particularly for group configurations having a larger number of zone players.  *Id.*

---

[4] U.S. Patent No. 8,234,395 is cited on the face of all the asserted patents in this case, and thus, is part of each of their respective intrinsic records.
[5] In its brief, Google for the first time requests that "zone" be construed in the Direct Control Patents as well.  This request should be rejected because it is both untimely and unnecessary, as the term "zone" as used in those patents is already clear on its face.

To address this inefficiency, Sonos's new mechanism for grouping enables a user to (i) pre-create and pre-save a predefined group of zone players at some time prior to when the user wishes to actually play media in that group, and then (ii) when the user later wishes to play media in that group configuration, simply invoke the previously-saved group for synchronous playback without having to select the zone players to be included in the group in an *ad hoc* manner at that time. *Id.* at 8:22-36, 10:4-12, 10:21-22; '407 Prov. at pp. 30-35. The Zone Scene Patents refer to this kind of predefined group of zone players as a "zone scene," and teach that each zone scene comprises an identification of the particular group configuration of zone players that has been predefined and saved for later invocation (*i.e.*, the makeup of the predefined group). *Id.* at 8:22-336, 8:60-67, 10:12-19; '407 Prov. at pp. 30, 37-41.

The Zone Scene Patents further disclose that zone players may store configuration data for the multi-zone system that includes data characterizing previously-saved zone scenes within the system, which may then be provided to controllers of the system in order to facilitate user interaction. *Id.* at 5:51-57, 7:31-33. The Zone Scene Patents refer to this configuration data in terms of "one or more ***zone configuration*** files." *Id.*

Consistent with the foregoing, the claims of the '206 Patent recite a "multimedia controller" that is configured to:

> receive, via a network interface, a ***zone configuration*** from a first independent playback device of a plurality of independent playback devices, wherein the ***zone configuration*** is configured via the controller and maintained at the first independent playback device, and wherein the ***zone configuration*** characterizes one or more ***zone scenes***, each ***zone scene*** identifying a ***group configuration*** associated with two or more of the plurality of independent playback devices;

*Id. at Cl. 1*. This claim language, both on its own and in view of the specification, clearly informs a POSITA that (1) "group configuration . . ." refers to a grouping of zone players for synchronous playback, (2) "zone scene identifying a group configuration . . ." refers to a special kind of group

configuration that is predefined and saved for later invocation, and (3) "zone configuration [that] characterizes one or more zone scenes" refers to configuration data that provides an indication of one or more zone scenes.[6]  Ex. 26 at ¶¶ 63-66.

Thus, a POSITA would have no issue reasonably discerning the meaning of this claim language, and Google's attempt to divorce the term "zone scene" from the term "group configuration" and interpret these terms in isolation is without merit.  In the context of the claim language, it is clear that "zone scene identifying a group configuration . . ." is a single, definitional phrase that is intended to collectively define the confines of the claimed "zone scene" – namely, that it a previously-saved grouping of zone players that are to be configured for synchronous playback of media when the zone scene is invoked.[7]  *Id.* at ¶¶ 64, 69.

Moreover, while Google alleges that a POSITA would be unable to distinguish the term "zone configuration" from the terms "zone scene" and "group configuration," Google makes no real effort to interpret those terms in the context of the claim language, which clearly informs a POSITA as to the meaning and interrelationship between these terms.  Instead, Google's lead tactic is to highlight a few statements from the specification that, according to Google, conflate the term "zone configuration" with the terms "zone scene" and "group configuration."  However, not only are Google's specification-based arguments irrelevant given that the meaning of these terms is

---

[6] Google nitpicks Sonos's construction of the "zone configuration" phrase on the basis that Sonos's use of the transition "provides an indication of" in place of "characterizes" is "unhelpful and incorrect."  While Sonos disagrees, in order to reduce the issues for the Court, Sonos is amenable to changing from "provides an indication of" to "provides a ***characteristic*** of" or simply re-using the claim term "***characterizes***," such that Sonos's construction would become "configuration data that [characterizes / provides a characteristic of] one or more zone scenes."  From the perspective of a POSITA, these different options are interchangeable in this context.  Ex. 26 at ¶ 61.

[7] *See IGT v. Bally Gaming Int'l, Inc*., 659 F.3d 1109 (Fed. Cir. 2011) ("Extracting a single word from a claim divorced from the surrounding limitations can lead construction astray."); *Roy-G-Biv Corp. v. ABB, Ltd*., Case No. 11-cv-622, 2013 WL 3884192, at *9 (E.D. Tex. July 25, 2013) (finding it "necessary" to construe term "as it is defined in the claims").

clear based on the claim language alone, but they also lack merit.

For instance, Google's argument that the specification conflates the terms "zone configuration" and "zone scene" is based exclusively on a single use of the label "Zone Configuration/Scene" in FIG. 3A. However, this argument completely ignores the specification's earlier discussion of the one or more "zone configuration files" stored in the memory of a zone player, which is undeniably a description of **configuration data**. *Id.* at ¶¶ 72, 75. [8]

Further, Google's argument that the specification conflates the term "zone configuration" with "group configuration" is based on passages from the specification that never even use the claim terms "zone configuration" and "group configuration" on their own – let alone use those terms "synonymously" as Google contends. *See* Ex. 1 at 5:51-59 (referring to "one or more saved zone configuration files" and "a saved zone group configuration file" but making no mention of a "zone scene identifying a group configuration").

Finally, Google's argument that it cannot distinguish between configuration data that "characterizes one or more zone scenes" and a "zone scene" itself is based on an unduly-narrow interpretation of "zone scene" that is limited to a computer data representation of the "zone scene" and nothing else, which is not consistent with the description in the intrinsic evidence. A "zone scene" is described as a previously-saved, predefined group configuration that is framed from the **perspective of a user** rather than being limited only to its representation in computer data. *Id.* at 8:19-36, 10:4-10, 10:21-22. [9]

---

[8] Google takes its feigned ignorance even further by saying it does not see how a reference to "zone configuration **files**" refers to configuration **data**, despite the fact that a "file" stored in a device's memory is well understood to mean a collection of **data** stored in memory. *Id.* at ¶¶ 66, 72-73.

[9] Google argues that its attempt to limit "zone scene" to a "data representation" is justified by the fact that Sonos's construction and the specification both use the word "saved" when referring to a "zone scene," but this argument is nonsense – the term "saved" is used all the time in common parlance to refer to the **user action** of saving something using software.

**VI.   "Zone Scene … "**

The parties agree on several aspects of the "zone scene" terms.  First, the parties agree that "zone scene" is a coined term.  Second, the parties agree that "zone scene" refers to a specific type of grouping of zone players.  But the parties disagree on how to define this type of grouping.

Sonos's construction faithfully captures the defining characteristic of the claimed "zone scene" by construing it in the context of its surrounding, definitional claim language to mean "a previously-saved grouping of zone players that are to be configured for synchronous playback of media when the zone scene is invoked."   In contrast, Google's construction fails to account for this defining characteristic of the claimed "zone scene" that distinguishes it over a "zone group" created in an ad-hoc manner, and in its place, Google attempts to require that the zone players included in the "zone scene" be "grouped according to a common theme by configuring the zones in a particular scene (*e.g.*, morning, afternoon or garden)" – which is flawed for several reasons.

***First***, the parties agree that "zone scene" is a coined term, and that the Zone Scene Patents use the shorthand term "scene" and the term "theme" as synonyms for "zone scene."  DI 64, p. 13.  When placed in this proper context, Google's proposal requiring the "zone scene" to be "grouped according to a common theme by configuring the zones in a particular scene" is circular, confusing, and borderline nonsensical – it requires the "zone scene" to be grouped according to a common "zone scene" by configuring the zones in a particular "zone scene."

***Second***, in advocating for use of the synonymous terms "theme" and "scene" in its construction, Google appears to suggest that this imposes an additional requirement for a "zone scene" to include what Google refers to as "thematic information," a phrase Google invented that appears nowhere in the specification.   In support of this statement, Google points to the specification's reference to "morning, afternoon, or garden."   However, the Zone Scene Patents make clear that those are nothing more than non-limiting examples of names (or labels) that could

be used to identify a "zone scene," and never once characterizes these names as "thematic information." Ex. 1 at 8:29-36, 9:37-39; '407 Prov. at 30, 38. More importantly, there is nothing in the intrinsic evidence that would require the claimed "zone scene" to include so-called "thematic information," and Google's attempt to import that limitation into "zone scene" is improper.[10]

## VII.   "Causing the Selectable Indication … to Be Displayed"

As a concession that the phrase "causing the selectable indication … to be displayed" of claim 19 of the '206 Patent has a clerical error in its dependency clause (erroneously identifying claim 17 instead of 18) that the Court can correct, Google changed its position and now argues that claim 19 is indefinite because the exact same sequence of words "selectable indication of at least one of the one or more zone scenes to be displayed" allegedly does not have antecedent basis. However, Google fails to acknowledge that claim 18 limits claim 17's "caus[ing] the selectable indication" function by requiring that function to "comprise[] causing an indication of at least one of the one or more zone scenes to be displayed." Thus, claim 18's "causing an indication of at least one of the one or more zone scenes to be displayed" refers back to claim 17's "caus[ing] the selectable indication" function, thereby providing antecedent basis for claim 19's "causing the selectable indication of the at least one of the one or more zone scenes to be displayed."[11]

## VIII.   "Local Area Network"

As Google conceded in the ITC action and its expert conceded in this case, a "LAN" is a type of a "data network." DI 60, Ex.7 at 16-17; Ex. 28 at 55:24-25, 56:3. Despite also conceding that "LAN" is a term of art in networking with a well-known meaning, Google and its expert ignore

---

[10] Google attempts to justify importing this additional limitation into "zone scene" by arguing that Sonos's construction fails to account for the "scene" aspect of that term. This argument once again fails to recognize that the Zone Scene Patents use the term "scene" as a shorthand for the coined term "zone scene," not as a reference to some constituent part of a "zone scene."

[11] Notably, Google has only challenged claim 19 despite claim 14 also reciting the same language (but without the clerical error in its dependency clause).

that well-known meaning and argue that a "LAN" (i) does not have the characteristics of a "data network" (discussed below in Section XII) and (ii) does not span a limited area.[12]

In doing so, Google ignores the fact that the term "LAN" was coined over 50 years ago when "the increasing demand and usage of *computers* in universities and research labs in the late 1960s generated the need to provide high-speed interconnections between *computer* systems." https://en.wikipedia.org/wiki/Local_area_network; *see also* DI 60-14 at 674, 676.  Since then, "LAN" has come to have a well-known meaning in the field of networking as a limited area computer network, which has the characteristics of a "data network." *See id.*; Ex. 27 at ¶¶ 66-80.

In failing to acknowledge the well-known meaning of "LAN," Google's expert went so far as to testify that *two cups* connected by a short *string* constitutes a "LAN." Ex. 28 at 152:25-155:11.  The '615 Patent, however, makes clear to a POSITA that a "LAN" is a computer network —no proper POSITA would refer to two cups on a string as a "LAN."  Thus, "LAN" should be given its well-known meaning as a type of "data network" (or "computer network").

## IX.    "Cloud"

Google concedes that its original construction was wrong and now asks to construe "cloud" as "over a wide-area network such as the Internet."  DI 64 at 21.  But swapping that phrase for "cloud" in claim language like "one or more first cloud servers" and "a cloud-based computing system associated with a cloud-based media service" will likely cause jury confusion.  There is no need to construe "cloud" because it is a term that the jury already understands.

## X.    "A Media Particular Playback System"

There is no *reasonable* debate that the phrase "media *particular* playback system" found

---

[12] As to the geographic range of a "LAN," Google mischaracterizes Sonos's construction by reading the phrase "such as a home or office" to be exhaustive.  To be clear, Sonos does not dispute that a "LAN" could have a maximum range of some other limited area.

in claims 3, 15, and 26 of the '615 Patent contains a typographical error (i.e., the inclusion of the word "particular") that is correctable by this Court.  While Google tries to manufacture other interpretations of this phrase, not one is reasonable since each is inconsistent with how a POSITA would interpret the phrase in view of the claims and specification.  Ex. 27 at ¶¶ 81-99.

Specifically, a POSITA having read the '615 Patent would not reasonably interpret the phrase as a "playback system that can only play particular media formats" (*e.g.*, only MP3 formats) because the '615 Patent provides no support for such a system.  *Id.* at ¶¶ 83-85.  Likewise, a POSITA having read claims 3, 15, or 26 would not reasonably interpret this phrase as a "playback system that can only play … particular media types" or "a playback system specific to a particular type of media" given that each of these claims continues to recite "playing back ***the multimedia content***" instead of reciting "playing back the content of the particular [media types or type of media]," which would be required under Google's proposal.  *Id.* at ¶¶ 83-84, 86-90.

Google's only other argument is that "media particular" was meant to distinguish a "playback system" that can play back media from one that cannot.  Even assuming a POSITA would interpret "media particular playback system" in this manner (which Dr. Schmidt disputes (*see* Ex. 27 at ¶¶ 91-93)), that would leave two options: the phrase (i) refers to a playback system that can play back media or (ii) has an error that the Court can correct to recite "media playback system."[13]  Both options have the same meaning and result in the phrase ***not*** being indefinite.

## XI.   "Data Network"

Google interprets the well-known term of art "data network" contrary to its plain and ordinary meaning.  Ex. 26 at ¶¶22-51; Ex. 27 at ¶¶ 24-65.  Google reaches its flawed interpretation

---

[13] *Cf. CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1359 (Fed. Cir. 2011) (finding claim not indefinite when each reasonable interpretation would result in the same claim scope and thus, there was no reason to avoid correcting it).

by breaking the term "data network" into two separate words, ascribing a dictionary definition to the word "data," and then reading this isolated definition back into the term "data network."[14] Google then contends that the plain and ordinary meaning of "data network" would encompass **any** "network" that carries "data" of **any form** between devices. *Id.* at ¶¶ 26-30, 57-60. In fact, Google's expert remarkably testified that talking over two cups connected by a string constitutes a "data network." Ex. 28 at 60:18-61:2. Google has not only failed to construe the term "data network" **as a whole**, but it has improperly rendered the term "**data** network" meaningless by indistinguishably equating that term to just a "network."[15] This is how a layperson might interpret the term "data network," **not** how a POSITA would.[16] Ex. 27 at ¶¶ 26-30; Ex. 26 at ¶¶25-27.

In contrast, Sonos's construction captures a POSITA's understanding that "data network" came about to refer to emerging computer networks and was specifically meant to distinguish older analog and voice networks, such as circuit-switched networks, telephone networks, and cellular networks of the time. Ex. 26 at ¶¶38-41; Ex. 27 at ¶¶ 34-39. These new "data networks" connect digital computer devices and enable them to both send and receive digital data packets. *Id.* In fact, Google's own expert's analysis reaches this same conclusion. *Id.* at ¶¶ 31-33; Ex. 26 at ¶35.

While Google asserts that the term "data network" also applies to these older "networks" that carry analog voice signals, Google fails to present any credible evidence to support its assertion that a POSITA would consider a "voice network" to be a "data network," which is

---

[14] *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1359-60 (Fed. Cir. 2005) (rejecting construction of the term "download component" that was based on the combination of two dictionary definitions of "download" and "component").

[15] *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction [giving] meaning to all [] terms of the claim is preferred over one that does not ...").

[16] *Fintiv, Inc. v. Apple, Inc.*, Case No. 18-CV-372-ADA, Dkt. 86 at 13-14 (W.D. Tex. Nov. 27, 2019) (ruling that a term needed to be construed to reflect its technical (as opposed to non-technical) meaning, since claims are construed from perspective of a POSITA, not a layperson).

unsurprising because these are distinctly different networks. Ex. 27 at ¶¶ 33-39.[17]   More concerning, Google's interpretation of "data network" is so broad that it would read on ordinary speaker wires carrying analog audio from a centralized A/V receiver to passive speakers, which is exactly the type of "conventional" system that Sonos's patents distinguished and improved upon with its networked system of "zone players" that are digital data processing devices connected to a "data network." *Id.* at ¶¶ 57-60; Ex. 26 at ¶¶ 31-33.  Google's attempt to broadly interpret "data network" is contrary to Sonos's patents that disclaim such "conventional" systems.[18]

## XII.   "Remote Playback Queue"

Google does not argue that the meaning of "remote playback queue" requires the queue to be provided by a third-party application.  Instead, Google seeks to import this limitation from the specification into the claims because, according to Google, to the extent the specification discloses a remote playback queue, it "***solely***" discloses embodiments where the queue is provided by a third-party application.  DI 64, pp. 25-26 (citing '033 Patent at 12:41-64, 16:59-61, 16:64-67).

Google's argument is both factually and legally wrong.  For example, to support its argument, Google cites the following: "In certain embodiments, a shared queue is provided

---

[17] Google wrongly portrays Sonos's construction as requiring each device to be capable of ***direct, bidirectional*** communication with every other device on the "data network."  Sonos's construction merely acknowledges that a "data network" enables devices to ***both send and receive*** over the "data network" (*i.e.*, enables two-way communication).  Thus, Sonos's construction does not exclude "token-ring networks," which indisputably enable devices to engage in ***two-way*** communication. Ex. 27 at ¶¶ 43-48.  Further, while Google identifies "data diode networks, broadcast networks, and multicast networks" as examples of "unidirectional networks," Google fails to present any credible evidence to support its assertion that a POSITA would consider these "networks" to be a "data network." *Id.* at ¶¶ 49-56; Ex. 26 at ¶¶49-50.

[18] Sonos acknowledges that the ITC CALJ construed "local area network" to require a "data communications network" but declined to require the transfer of digital data packets.  Sonos respectfully disagrees with the CALJ's conclusion, which is contradicted by the overwhelming evidence here showing "data network" is a term of art that refers to a specific class of networks that enable transfer of digital data packets.  And contrary to Google's assertion (DI 64 at 25), the CALJ did not reject the notion that a "data network" requires two-way communication.

between the local playback system and the third-party application to keep the local system and application synchronized." *Id.* at 25-26 (citing '033 Patent at 16:64-67). This disclosure does not state that the "shared queue" is provided *by* the "third party application," but rather explains that the "shared queue" is "provided *between*" the "local playback system" and the "third party application." As such, this disclosure of a "shared queue" is not party- or application-specific.

Even if Google's argument was factually correct, the Federal Circuit has made clear that it is improper to read details from a preferred embodiment into the claims—even if it is the *only* embodiment—absent a clear disclaimer in the intrinsic record. There is no such disclaimer here. To the contrary, the disclosures cited by Google merely describe "certain embodiments" and do not indicate that the remote playback queue being provided by a third-party application is an essential component of the invention, nor do they contain a clear disclaimer of a remote playback queue that is provided by something other than a third-party application. *See Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) (rejecting importation of "pressure activated seal" limitation where specification "do[es] not expressly state that the pressure activated seal is an essential component of the invention"); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906-908 (Fed. Cir. 2004) (rejecting importation of "pressure jacket" limitation where "the written description does not contain a clear disavowal of embodiments lacking a pressure jacket.").

The cases relied on by Google (*see* DI 64, p. 26) are inapplicable. In *Groove*, the Federal Circuit construed the term "applet" to require a "geotargeting" limitation where the specification described "the '*present invention*' as 'delivering and serving *local* content and advertisements'" and stated that "the *primary field needed* for target delivery of applets is a *zip code*." *Groove Digital, Inc. v. United Bank*, 825 F. App'x 852, 857-58 (Fed. Cir. 2020). Likewise, in *Inpro II*, the Federal Circuit construed the term "host interface" as "a direct parallel bus interface" where

"[t]he specification characterizes the direct bus interface as a '*very important* feature' of the invention, stating that a 'direct' connection is *necessary* to provide 'direct' access …." *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1353-55 (Fed. Cir. 2006). And in *ICU*, the Federal Circuit construed the term "spike" to require "a pointed tip," which was supported by the term's ordinary meaning. *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1375 (Fed. Cir. 2009). Here, in contrast, the '033 Patent does not describe the "invention" as "need[ing]" a third-party application to provide a remote playback queue nor does it describe such an application as a "very important feature."

### XIII.   "An Instruction … to Take Over Responsibility for Playback"

It is Google (not Sonos) that "misconstrues the relevant claim language." DI 64, p. 27. The language that immediately follows "an instruction" describes what the "instruction" is/requires, namely, "*an instruction* for the at least one given playback device *to take over responsibility for playback of the remote playback queue from the computing device*." As previously explained, applying the well-established rule that an indefinite article "an" means "one or more," "an instruction" in this limitation means "one or more instructions." DI 60, pp. 28-29.

Google ignores this language that recites what the "instruction" is/requires and instead focuses on the subsequent "wherein" clause reciting what Google refers to as "three sub-steps." DI 64 at 27-29. Contrary to Google's assertion, however, the "wherein" clause does not "require[] that there be one instruction … and that the … *instruction* perform all three sub-steps." *Id*. at 29 (emphasis added). Instead, the "wherein" clause describes three functions that the "*playback device*" is operable to perform after receiving the claimed "instruction," which as explained above could be one or more instructions. *E.g.*, '033 Patent at claim 1 ("wherein the instruction configures the at least one given *playback device* to (i) … (ii) … and (iii) …"). Importantly, the "wherein" clause also does not require that the "instruction" actually instruct the "playback device" to

14

perform the three "sub-steps."  As recited in the claims, the "instruction" need only instruct the "playback device to take over responsibility for playback of the remote playback queue."

To support its construction, Google also mischaracterizes the prosecution history.  Sonos did not "distinguish[] the *Gran* reference because it required transmitting multiple 'continuous' instructions, rather than a single instruction to take over playback responsibility."  DI 64 at 28. Instead, Sonos distinguished *Gran* because "the media rendering device in *Gran* never '***take[s] over responsibility for playback of [a] remote playback queue***' from control element 100," regardless of the number of instructions it receives.  DI 64-18, p. 18 (emphasis in original).

## XIV.   **"Wherein the Instruction Comprises an Instruction"**

Instead of conceding that "wherein the instruction comprises an instruction" follows a common claim-drafting technique that Google routinely uses, Google conjures up another baseless indefiniteness attack.[19]  But where, as here, a dependent claim simply provides more specificity for a previously-recited limitation using the word "comprises," a POSITA would have no trouble understanding the scope of the claim with reasonable certainty.  Ex. 27 at ¶¶ 100-107.

Dr. Kyriakakis's purported confusion between "transmitting an instruction" over a data network (which is the "instruction" that the phrase "wherein the instruction comprises an instruction" further limits) and the separately claimed "program instructions" stored on memory confirms that Dr. Kyriakakis has applied an improper level of ordinary skill and his opinions should be disregarded.  *See, e.g.*, *id.* at ¶¶ 17-22, 105-107.

---

[19] Google's cited case is inapposite.  There, the patentee ***admitted*** that the claims as written required "an impossibility" (generating a ***single*** file comprising a ***directory*** of files) and sought to rewrite the claim to "require a digital media [file] that is ***a part of*** a directory," as opposed to a media file ***comprising*** a directory of files. *See Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1364, 66-67 (Fed. Cir. 2021).

Dated:  June 15, 2021      Respectfully submitted,

            By:  */s/ Mark D. Siegmund*
              Mark D. Siegmund

            Jeffrey L. Johnson
            Texas Bar No. 24029638
            ORRICK, HERRINGTON & SUTCLIFFE LLP
            609 Main Street, 40th Floor
            Houston, TX 77002
            Telephone:  713.658.6400
            Facsimile:  713.658.6401
            jj@orrick.com

            Clement Seth Roberts (admitted *pro hac vice*)
            California Bar No. 209203
            ORRICK, HERRINGTON & SUTCLIFFE LLP
            405 Howard St.
            San Francisco, CA 94105
            Telephone:  415.773.5484 Facsimile:
            415.773.5759
            croberts@orrick.com

            Bas de Blank (admitted *pro hac vice*)
            California Bar No. 191487
            ORRICK, HERRINGTON & SUTCLIFFE LLP
            1000 Marsh Blvd.
            Menlo Park, CA 94205
            Telephone:  650.614.7343 Facsimile:
            650.614.7401
            bdeblank@orrick.com

            Alyssa Caridis (admitted *pro hac vice*)
            California Bar No. 260103
            ORRICK, HERRINGTON & SUTCLIFFE LLP
            777 South Figueroa St., Suite 3200
            Los Angeles, CA 90017
            Telephone:  213.612.2372 Facsimile:
            213.612.2499
            acaridis@orrick.com

            George I. Lee (admitted *pro hac vice*)
            Illinois Bar No. 6225430
            Sean M. Sullivan (admitted *pro hac vice*)
            Illinois Bar No. 6230605

Rory P. Shea (admitted *pro hac vice*)
Illinois Bar No. 6290745
J. Dan Smith (admitted *pro hac vice*)
Illinois Bar No. 6300912
LEE SULLIVAN SHEA & SMITH LLP
656 W. Randolph St., Floor 5W
Chicago, IL 60661
Telephone:  312.754.9602
Facsimile:  312.754.9603
lee@ls3ip.com
sullivan@ls3ip.com
shea@ls3ip.com
smith@ls3ip.com

Mark D. Siegmund
State Bar No. 24117055
mark@waltfairpllc.com Law
Firm of Walt, Fair PLLC.
1508 North Valley Mills Drive
Waco, Texas 76710
Telephone: (254) 772-6400
Facsimile: (254) 772-6432

*Attorneys for Plaintiff Sonos, Inc.*

### CERTIFICATE OF SERVICE

The undersigned certifies that on June 15, 2021, all counsel of record who are deemed to

have consented to electronic service are being served with a copy of this document through the

Court's CM/ECF system.

By:  */s/ Mark D. Siegmund*
        Mark D. Siegmund

17